

**FILED**

**JAN 13 2012**

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| J.L. WARD ASSOCIATES, INC., | * | CIV 11-4008-RAL |
| | * | |
| Plaintiff, | * | |
| | * | OPINION AND ORDER |
| vs. | * | GRANTING IN PART |
| | * | MOTION·TO DISMISS |
| GREAT PLAINS TRIBAL | * | |
| CHAIRMEN'S HEALTH BOARD, | * | |
| formerly known as Aberdeen Area Tribal | * | |
| Chairmen's Health Board, | * | |
| | * | |
| Defendant. | * | |

## I. INTRODUCTION

Plaintiff J.L. Ward Associates, Inc. ("J.L. Ward") sued Defendant Great Plains Tribal Chairmen's Health Board ("Great Plains"), claiming that Great Plains committed a breach of contract and infringed on copyrights held by J.L. Ward. Doc. 14. Great Plains seeks, and J.L. Ward opposes, dismissal of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. Doc. 16, 17, 21, 25, 28. For the reasons explained below, the Court grants in part the motion to dismiss and permits J.L. Ward twenty-one days from the date of this Order to amend its Complaint if it chooses to make a claim to compel arbitration of certain claims.

## II. FACTS

Great Plains[1] was incorporated in 1992 under South Dakota law as a non-profit corporation. Doc. 22-1 at 4. Sixteen federally recognized Indian tribes from the four-state area

---

[1] At the time of its initial incorporation, the entity created was Aberdeen Area Tribal Chairmen's Health Board. That entity changed its name on September 3, 2010, to Great Plains Tribal Chairmen's Health Board. (Doc. 15).

of South Dakota, North Dakota, Nebraska, and Iowa formed[2] Great Plains in order to provide the

Indian people of the Great Plains area with a single entity to communicate and participate with

the Indian Health Service[3] ("IHS") and other federal agencies on health matters. Great Plains

Articles of Incorporation, Art. III; His Horse is Thunder Aff. ¶ 3. In pursuing this policy, Great

Plains' objectives are:

> 1. To improve the effectiveness of the Indian health program
> through responsible participation of the Indian people in making
> decisions about their health services, in order to improve their
> health status.
> 2. To assist the IHS in establishing program priorities and in
> distributing existing resources.
> 3. To advise and assist the Director, [Great Plains Area] Indian
> Health Service, in developing long-range program plans.
> 4. To represent the Indian interests and desires at all levels for
> health related programs.
> 5. To assist in development of Indian responsibility for community
> activities affecting health.
> 6. To assist member tribes in the development of health programs
> that will be beneficial to the Tribes.
> 7. To establish participation in any meetings that will provide clear
> and concise information to the Tribes.
> 8. To represent the organization and member tribes in the Congress
> of the United States at any hearings and at National Organization
> meetings regarding health issues and care.

Great Plains Articles of Incorporation, Art. III. The governing board of Great Plains includes the

president or chairperson from each of the sixteen tribes, the chairman from the Rapid City Indian

---

[2] Although J.L. Ward argues to the contrary, the Court is satisfied that the sixteen tribes formed
Great Plains, as Great Plains' Articles of Incorporation make clear that the original incorporators
were the tribal chairmen or presidents from the majority of the sixteen tribes. Articles of
Incorporation. Art. XI; see also His Horse is Thunder Aff. ¶ 3 (explaining that Great Plains "was
formed and is operated and governed by the sixteen (16) federally-recognized Indian tribes through
a board of directors comprised of their respective tribal chairpersons . . .").

[3] "The Indian Health Service is a separate agency within the Department of Health and Human
Services responsible for providing federal health services to American Indians and Alaskan
Natives." Felix Cohen, Cohen's Handbook of Federal Indian Law, § 22.04[2][a] (2005 ed.).

Health Advisory Board, and the chairman from the Trenton Indian Service Area Board. Great

Plains Articles of Incorporation, Art. IV; His Horse is Thunder Aff. ¶ 3. Members of the

governing board of Great Plains must relinquish their position "when they fail to be re-elected

by their Tribal or other governing body to be an official delegate to the [Great Plains] Area Tribal

Chairmen's Health Board." Great Plains Articles of Incorporation, Art. VIII.

Although the tribal governing bodies of the sixteen tribes are not required to be involved

with Great Plains, "decisions made by [Great Plains] on all on-going programs shall be final."

Id. at Art. IX. Article X of Great Plains Articles of Incorporation addresses the finances of Great

Plains as follows:

> In the event this Board accrues any net earnings, no part of the net
> earnings shall enure to the benefit of, or be distributed to, the
> members, trustees, officers, or to other private persons, except
> that the Corporation shall be authorized and empowered to pay
> reasonable compensation for services rendered, and to make
> payments and distributions in furtherance of the purposes set forth
> in Article III hereof.

Art. X.

In addition to communicating with IHS on behalf of the sixteen tribes, Great Plains also

enters into "self-determination contracts"[4] under the Indian Self-Determination and Education

Assistance Act ("ISDEAA"). His Horse is Thunder Aff. ¶ 5. Congress enacted the ISDEAA in

1975 to encourage Indian self-determination by providing for the transition of federal programs

and services for Indians to the control of Indian communities. See 25 U.S.C. § 450(a); Cherokee

Nation of Okla. v. Leavitt, 543 U.S. 631, 634 (2005). Under the ISDEAA, tribes and tribal

---

[4] A "self-determination contract" is a "contract (or grant or cooperative agreement utilized
under section 450e-1 of this title) entered into under part A of this subchapter between a tribal
organization and the appropriate secretary for the planning, conduct and administration of programs
or services which are otherwise provided to Indian tribes and their members pursuant to Federal
law." 25 U.S.C. § 450b(j).

3

organizations[5] may enter into self-determination contracts with the Secretary of Health and Human Services or the Secretary of the Interior to take over administration of programs formerly administered by the federal government on behalf of the tribe. See Hinsley v. Standing Rock Child Protective Services, 516 F.3d 668, 670 (8th Cir. 2008); Cohen, supra, at § 22.02[1].

J.L. Ward is an American Indian-owned corporation that works with tribes, Indian organizations, universities, and federal agencies to plan, develop, implement, and evaluate programs and services in the areas of primary health care, substance abuse and mental health care, and Indian affairs. Ward Aff. ¶ 2. In early 2006, Great Plains' Board of Directors passed a corporate resolution authorizing Great Plains to work with J.L. Ward to prepare and submit an application to the Substance Abuse and Mental Health Services Administration ("SAMHSA") for a 2007 Access to Recovery ("ATR") grant. Ward Aff. ¶ 4; Doc. 23-3. J.L. Ward prepared the 2007 ATR grant application, which was then submitted to SAMHSA in March or April of 2007. Ward Aff. ¶ 4.

In August of 2007, Great Plains and J.L. Ward entered into a contract for J.L. Ward's scope of work relating to Great Plains' 2007 application. Id.; Doc. 23-1. The 2007 contract provided that "[i]f the [Great Plains] 2007 ATR grant application is not approved and funded, this Agreement shall terminate and neither party shall have any further obligation to the other or duty under this Agreement, except that sections 12, 13, and 14 shall survive termination." Doc.

---

[5] The ISDEAA defines a "tribal organization" as "the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities: *Provided*, That in any case where a contract is let or grant made to an organization to perform services benefitting more than one Indian tribe, the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant." 25 U.S.C. § 450b(l).

23-1. Sections 12 and 13 of the 2007 contract addressed the parties' intellectual and copyright

interests in the 2007 ATR grant application. Section 14 contained a dispute resolution clause,

which stated:

### 14. Third Party Mediation.

If any dispute arises between the parties concerning the interpretation or enforcement of the provisions of this Agreement, the parties agree in good faith to promptly resolve the dispute through mediation, using a neutral mediator agreed upon by the parties. The expenses of mediation shall be borne pro rata by the parties for no more than a half day of mediation services. No other mediation expense shall be incurred by the parties unless agreed to in a separate writing signed by both parties. "Promptly," as used in this section, shall mean within forty-five (45) days of either party making a written request for mediation. If the parties are unable to resolve the dispute within thirty (30) days after completion of mediation, then all matters in controversy shall be  submitted to arbitration pursuant to South Dakota Statutes, using the offices of the American Arbitration Association or other neutral arbitration service agreed upon in a writing signed by both parties.  The expenses of arbitration shall be advanced on a pro rata basis by the parties. Regardless of the arbitration service ultimately utilized by the parties, only one arbitrator shall be employed or empaneled to hear and decide the matter and no more than forty (40) hours of work shall be authorized to the arbitrator to perform any and all services related to the rendering of the arbitration award.  These limitations upon the scope and expense of the arbitration may not be waived or modified unless in writing signed by both parties. The arbitrator shall make any award proper under the law; however, neither party shall be liable for consequential or punitive damages. In addition, the arbitrator shall award reasonable attorneys fees and costs to the prevailing party, as well as pre-judgment interest at legal rate running from the date of any breach of this Agreement.  "Costs" as used herein shall, in addition to those ordinary costs allowed under law, include all actual costs reasonably and necessarily incurred in the action including (but not limited to) the expense of expert witnesses and consultants, the expense of pre-arbitration mediation services and the expense of the arbitration services.  "Attorneys fees" as used herein shall include those attorneys fees incurred in the preparation for and/or attendance at pre-arbitration mediation, as well as the arbitration itself and in any court proceedings related to or arising from the arbitration. Either party making a written demand for arbitration on the other party shall initiate the arbitration process. The parties agree that either party may seek judicial review by way of a petition to the court to confirm,

> correct or vacate an arbitration award pursuant to A.R.S. § 12-1501 et
> seq. The mediation, the arbitration and any application to the court or
> other court proceedings shall be venued exclusively in Rapid City, South
> Dakota.

Id. Despite the efforts of J.L. Ward and Great Plains, SAMHSA did not award Great Plains an

ATR grant based on the 2007 application. Ward Aff. at ¶ 5.

On August 12, 2009, James Ward ("Ward"), J.L.Ward's president and chief executive

officer, and Great Plains' then executive director, Dr. Don Warne ("Warne"), had a conversation

about the failed 2007 ATR grant application. Ward and Warne also discussed that funding for

2010 ATR grants was included in President Barack Obama's proposed budget. Id. at ¶ 6. Ward

suggested the same arrangement with Great Plains that the parties had agreed to in 2007. That

is, Ward proposed that J.L. Ward would prepare the grant/proposal application at no cost to

Great Plains in exchange for a commitment to a specific scope of work for the project. Id.

According to Ward's affidavit, Warne verbally agreed to an arrangement that was identical to the

2007 agreement between the parties. Id. On August 13, 2009, Ward sent an email to Warne

stating:

> Sorry to take up so much of your time yesterday just rambling on
> about our past proposal. We are really frustrated by it. Anyway,
> we look forward to moving on and working on this new
> opportunity. Hopefully all of our past work will aid us. Please let
> me know how we can best be of service to you. If you want to
> meet at some point at a particular place or time, let me know and
> I will make it happen. You can call me anytime to talk about the
> project.

Id. at ¶ 7; Doc. 23-4.

On January 4, 2010, SAMHSA announced the availability of funds for ATR grants. Doc.

23-13. On January 8, 2010, Ward and Warne again spoke on the telephone about J.L. Ward

planning and developing a 2010 ATR grant/proposal application for Great Plains. Ward Aff. ¶

6

8. During this conversation, Ward said that he would be providing Great Plains with an updated

contract. Id.

On January 26, 2010, Ward emailed Warne a copy of a contract ("2010 contract") for J.L.

Ward's involvement in Great Plains' 2010 ATR grant application. Ward Aff. ¶ 9. The January

26, 2010 email stated:

> Hi Don, attached is a copy of the ATR consultant agreement.
> This is the same language that we worked out with [Great Plains]
> in 2007. This will be a labor intensive project that will require us
> to work full-time hours (1.0 FTE) for the first year and gradually
> decrease our time in years 2, 3, and 4. There will be two of us
> from [J.L. Ward] working on your project. Please take a look at
> it and let me know if you have any questions. Please keep in
> mind that [J.L. Ward] has an existing proposal and materials that
> we should use for this application. All of these materials are
> copyrighted and by this agreement, we are giving you rights to use
> them for this project. We really need to get started ASAP and we
> should arrange some time to talk. One last thing, we will need a
> custom database to manage this project. We previously designed
> one to meet the ATR specifications that is available to this
> project. If you are interested in using it, we will need to execute
> an agreement for the system.

Doc. 23-5. The 2010 contract attached to the email discussed the services to be provided by J.L.

Ward and contained a dispute resolution clause that was identical to the one in the 2007 contract.

Doc. 23-2. On January 29, 2010, Warne sent an email to Ward saying that the two should find

time to talk and explained that Great Plains was "reviewing the proposal." Doc. 23-6.

On February 9, 2010, Warne and Ward exchanged emails attempting to set up a time to

discuss the 2010 contract. Ward Aff. ¶ 10; Doc. 23-7. On the following day, Ward emailed

Warne a copy of the Great Plains Board of Directors 2006 resolution that authorized Great Plains

to work with J.L. Ward to prepare and submit an application to SAMHSA for a 2007 ATR grant.

Doc. 23-8. On February 11, 2010, Great Plains passed a corporate resolution authorizing its

7

"Executive Director and staff to work with J.L. Ward Associates, Inc. to prepare and submit a grant application for the Access to Recovery Programs of SAMHSA." Doc. 23-9.

J.L. Ward planned and developed the 2010 ATR grant application at no cost to Great Plains. On March 7, 2010, Ward sent the final proposal to Warne. Ward Aff. ¶ 13. Warne signed the requisite ATR forms and the final proposal was submitted to SAMHSA on March 9, 2010. Id.; Doc. 23-14. While the 2010 ATR proposal was pending, Great Plains changed executive directors, replacing Warne with Ron His Horse is Thunder ("His Horse is Thunder"). Ward Aff. at ¶ 14.

On July 27, 2010, Warne received, and forwarded to Ward, an email from SAMHSA requesting information pertaining to a modification of the budget of Great Plains' 2010 ATR grant proposal. Id. at ¶ 14; Doc. 23-10. On the following day, Ward and Warne spoke on the phone twice and discussed the fact that the SAMHSA inquiry was a good indication that Great Plains would receive funding. Ward Aff. ¶ 15. Ward expressed concern to Warne that the parties did not have a signed written contract in place. Id. According to Ward's affidavit, Warne told Ward that Great Plains could not do the 2010 ATR project without J.L. Ward and that Warne would get the 2010 contract executed. Id. On August 10, 2010, according to Ward, Warne again assured Ward that the 2010 contract would be executed. Id.

On September 30, 2010, Great Plains received notice that SAMHSA had awarded Great Plains a 2010 ATR grant in the amount of $13,119,400 over a four year period. Id. at ¶ 16; Doc. 23-11. In the days following notification of the SAMHSA award, Ward and Great Plains exchanged communications regarding J.L. Ward's scope of work and proceeding with the 2010 ATR project. Ward Aff. ¶ 17. During an October 4, 2010 telephone conference, His Horse is Thunder requested that Ward email His Horse is Thunder a copy of the unsigned 2010 contract

8

and a request to start work. Id. His Horse is Thunder allegedly said that the 2010 contract would

quickly be signed and returned to Ward. Id. Shortly after this conversation, Ward emailed His

Horse is Thunder the following message:

> It was great talking with you today. Below we worked out a work
> schedule per month that describes how we plan to allocate our
> hours and contract funds over the course of the first year.
>
> * * * * *
>
> While we can expect some need to change hours here in [sic]
> there to meet project needs, we will work to maintain this
> schedule as close as possible. We will NOT exceed the total
> hours that we planned for the year. Thais and I are working today
> on a specific scope of work (SOW) with a detailed list of
> deliverables for the year that will correspond with this schedule
> . . . I will get the SOW draft to you as soon as it is ready. For
> now, I would like to request that you give us authorization to start
> work on this project today. We will start to accrue hours at a rate
> of $96.00 per hour (2010 Executive Level I Pay Rate). I will pay
> Thais and myself out of my corporate funds and when you are
> eligible to bill SAMHSA, I will send you an itemized invoice for
> our hours so that I can be reimbursed for the costs . . . Please let
> me know if there is anything else you need at this time.

Doc. 23-15. Ward also emailed His Horse is Thunder a copy of the 2007 contract and explained

that "[w]e will use the same language but will change the dollar amounts and will provide a more

detailed scope of work." Doc. 23-16.

On October 7, 2010, Ward emailed His Horse is Thunder the unsigned 2010 contract and

wrote "[i]t is the same as the last one that was executed. Except I changed the $ figures and

added exhibits to give detail of the scope of work, mostly in year 1. Years 2 through 4 are

maintenance years." Doc. 23-17. His Horse is Thunder responded to Ward's email on the

following day and stated: "You have our commitment to you, to pay for your work on our ATR

project commencing today. We will put in place the official binding contract as soon as we

receive an updated scope of work, etc." Doc. 23-18. According to J.L. Ward, the "updated scope

9

of work" already was in the 2010 ATR proposal signed by Warne and submitted to SAMHSA.

Ward Aff. ¶ 22. J.L. Ward maintains that there was no question as to what the scope of work

was to be between J.L. Ward and Great Plains. Id.

Subsequently, J.L. Ward began work on the 2010 ATR project. Id. On November 5,

2010, Ward received an email from His Horse is Thunder stating:

> James, I and staff are reviewing the full proposal for the first time,
> along with the associated budget. We are concerned about many
> issues to say the least, and do not wish to continue utilizing your
> firm's services. Please cease any further work on our behalf, and
> forward to us an itemized billing for services thus far. We have
> received two billing [sic] to date; we need a detailed narrative for
> each item billed. Also, we were under the assumption you were
> not going to bill for your time at the grantees mtg in DC last
> week.

Doc. 23-19. On November 10, 2010, J.L. Ward received a fax from Great Plains' attorney

stating:

> It appears that on October 8, 2010, Ron His Horse is Thunder
> indicated to you that he would pay for your work on their Access
> to Recovery project commencing on October 8, 2010. There was
> no contract, but merely this instruction to begin work, subject to
> you providing him with an updated scope of work and other
> materials. As you know, this was not a contract, but merely an
> authorization to begin work.
> On November 5, 2010, Executive Director Ron His Horse is
> Thunder sent you an e-mail in which he told you that after
> reviewing the full proposal and the associated budget, a number
> of concerns had arisen, and the Health Board had decided not to
> continue to utilize your firm's services.
> On November 5, 2010, Mr. His Horse is Thunder requested you
> to cease any further work on behalf of the Health Board and to
> send them an itemized billing for past services. This e-mail also
> disputed billing for attendance at a grant meeting in Washington
> D.C.
> At this time, the Health Board is hereby reiterating that you stop
> work, effective November 5, 2010, and further that you provide
> them with a detailed narrative of your billing between the time

10

> when your work was authorized and the time when you were
> asked to cease it, which was approximately a month or less. You
> may send the itemized billing to the Health Board in care of me,
> or you may send it directly to Mr. His Horse is Thunder, with a
> copy to me.
>
> * * * * *
>
> Thank you very much. We look forward to resolving the matter
> of any outstanding reasonable fees for work already performed
> which had been previously authorized, but we are specifically not
> authorizing any further work under this grant or any work that
> was outside of you instructions. Please let me know if you have
> any questions at all regarding any of this.

Doc. 23-20. After terminating J.L. Ward's services, Great Plains continued to use the 2010 ATR

project, including information J.L. Ward believes to be protected by copyrights. Ward Aff. ¶ 25.

J.L. Ward in its Amended Complaint, Doc. 14, against Great Plains alleges breach of

contract, promissory estoppel, negligent misrepresentation, fraudulent misrepresentation, unjust

enrichment, and infringement of J.L. Ward's copyrighted material. Great Plains filed a Motion

to Dismiss, Doc. 16, asserting that it is a tribal organization entitled to sovereign immunity and

that this Court lacks jurisdiction over J.L. Ward's Complaint.

## III. DISCUSSION

### A) Dismissal Under Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a suit when the

court lacks subject matter jurisdiction. Although a motion to dismiss on sovereign immunity

grounds can be analyzed under Rule 12(b)(1), Hagen v. Sisseton-Wahpeton Cmty. Coll., 205

F.3d 1040, 1043 (8th Cir. 2000), the question of whether the tribes' sovereign immunity bars J.L.

Ward from bringing this suit against Great Plains is a jurisdictional issue separate from subject

matter jurisdiction. In re Prairie Island Dakota Sioux, 21 F.3d 302, 305 (8th Cir. 1994) ("We

find, therefore, that sovereign immunity is a jurisdictional consideration separate from subject

matter jurisdiction . . ."); Calvello v. Yankton Sioux Tribe, 899 F. Supp. 431, 435 (D.S.D. 1995)

(determining first that the court had subject matter jurisdiction and then noting that "[t]he Court

must next consider, however, the separate jurisdictional issue of whether [the plaintiff's] suit

against the Tribe is barred by the doctrine of sovereign immunity."). The United States Court

of Appeals for the Eighth Circuit has drawn a distinction between facial and factual 12(b)(1)

motions, explaining the applicable standard in each instance. See Osborn v. United States, 918

F.2d 724, 728-730 (8th Cir. 1990). When faced with a factual 12(b)(1) motion like the one Great

Plains has made,

> the trial court may proceed as it never could under 12(b)(6) or
> Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion
> is the trial court's jurisdiction—its very power to hear the
> case—there is substantial authority that the trial court is free to
> weigh the evidence and satisfy itself as to the existence of its
> power to hear the case.  In short, no presumptive truthfulness
> attaches to the plaintiff's allegations, and the existence of disputed
> material facts will not preclude the trial court from evaluating for
> itself the merits of jurisdictional claims.

Id. at 730 (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir.

1977)). Here, the parties have submitted evidence in support of and in resistance to the motion

to dismiss, and the Court will consider such evidence as it relates to the jurisdictional challenge.

**B) Sovereign Immunity**

"Indian tribes have long been recognized as possessing the common-law immunity from

suit traditionally enjoyed by sovereign powers." Amerind Risk Mgmt. Corp. v. Malaterre, 633

F.3d 680, 685 (8th Cir. 2011) (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978));

Colombe v. Rosebud Sioux Tribe, No. Civ 11-3002, 2011 WL 4458795, at *5 (D.S.D. Sept. 23,

2011). J.L. Ward argues that sovereign immunity does not extend to an entity like Great Plains.

The Eighth Circuit has found that a tribe's sovereign immunity may extend to a tribal entity or agency. Hagen, 205 F.3d at 1043 (college that was chartered, funded, and controlled by tribe to provide education to tribal members on Indian land was tribal agency entitled to sovereign immunity); Dillon v. Yankton Sioux Tribe Hous. Auth., 144 F.3d 581, 583 (8th Cir. 1998) (a tribal housing authority, established by a tribal council pursuant to its powers of self-government, is a tribal agency and is therefore entitled to sovereign immunity); Weeks Const., Inc. v. Oglala Sioux Hous. Auth., 797 F.2d 668, 670-671(8th Cir. 1986) (tribal housing authority created by a tribal ordinance to develop and administer housing projects on the Pine Ridge Indian Reservation was a tribal agency entitled to sovereign immunity). In Hagen, Dillon, and Weeks, the Eighth Circuit considered it critical to the issue of entitlement to sovereign immunity that the organizations served as "arms of the tribe" and were established by tribal councils pursuant to the councils' powers of self-government. See Hagen, 205 F.3d at 1043 ("[T]he College serves as an arm of the tribe and not as a mere business and is thus entitled to tribal sovereign immunity."); Dillon, 144 F.3d at 583 (tribal housing authority established by tribal council pursuant to its powers of self-government was a tribal agency rather than "a separate corporate entity created by the tribe."); Weeks, 797 F.2d at 670-71 ("As an arm of tribal government, a tribal housing authority possesses attributes of tribal sovereignty and suits against an agency like the housing authority normally are barred absent a waiver of sovereign immunity.") (internal citation omitted); see also Native Am. Council of Tribes v. Weber, No. Civ. 09-4182, 2010 WL 1999352, at *9 (D.S.D. May 18, 2010) ("For a tribal agency to have sovereign immunity, the agency must be established by a tribal council pursuant to its powers of self-government and serve as an arm of the tribe."). Great Plains, however, is not an "arm" of a single tribe, but is composed of sixteen tribes.

Tribal sovereign immunity may extend to an organization created by more than one tribe. See Amerind, 633 F.3d at 685 (administrator of self-insurance risk pool for Indian housing authorities was entitled to sovereign immunity where administrator was incorporated by three charter tribes and issued a federal charter under 25 U.S.C. § 477); Taylor v. Ala. Intertribal Council Title IV, 261 F.3d 1032 (11th Cir. 2001). In Taylor, an employee of the Alabama Intertribal Title IV ("AIC") brought a 42 U.S.C. § 1981 employment discrimination claim against AIC. 261 F.3d at 1034. The Eleventh Circuit, finding that subjecting AIC to suit under § 1981 would contradict congressional intent and interfere with tribal self government, concluded that the claims against AIC must be dismissed as "barred by Indian sovereign immunity." Id. at 1034-36. The Eleventh Circuit explained that "AIC is an intertribal consortium, with a Board dominated by tribal chiefs and tribe members, organized to promote business opportunities for and between tribes; as such, we conclude that it is entitled to the same protections as a tribe itself." Id. at 1036; William C. Canby, American Indian Law 102 (5th ed. 2009) (citing Taylor for the proposition that tribal sovereign immunity applies to "intertribal councils.").

Two federal appellate courts, when faced with facts similar to those present in this case, have held that an organization formed by a group of tribes fell within the "Indian tribe" exemption of Title VII. Pink v. Modoc Indian Health Project, Inc., 157 F.3d 1185 (9th Cir. 1998); Dille v. Council of Energy Res. Tribes, 801 F.2d 373 (10th Cir. 1986). These Title VII cases do not directly concern whether an organization formed by a group of tribes is entitled to the tribes' sovereign immunity, but the discussion in the cases is instructive. Indeed, the Eighth Circuit has cited one of these Title VII cases in its discussion about whether a college was entitled to sovereign immunity. Hagen, 205 F.3d at 1043 (citing Pink); see also Cash Advance & Pref. Cash Loans v. State, 242 P.3d 1099, 1109 (Colo. 2010) (explaining that the line of Title

14

VII cases dealing with the "Indian tribe" exemption "is instructive with respect to the facts relevant to the determination whether a tribal entity is closely enough associated with the tribe to be entitled to the tribe's immunity."); Runyon ex rel B.R. v. AVCP, 84 P.3d 437, 440 (Alaska 2004) (citing Pink for the proposition that "[t]ribal status similarly may extend to an institution that is the arm of multiple tribes, such as a joint agency formed by several tribal governments.").

In Pink, a former employee of the Modoc Indian Health Project ("Modoc") brought suit against Modoc for alleged violations of Title VII. 157 F.3d at 1187. Modoc was a nonprofit corporation created by two federally recognized Indian tribes. Id. Modoc was organized to provide services to tribal members pursuant to the ISDEAA, and contracted with the IHS to provide health services to tribal members. Id. The district court dismissed the suit, concluding that Modoc was a "tribe" for purposes of Title VII and was therefore exempt from Title VII's definition of a covered "employer."[6] Id. The Ninth Circuit affirmed the district court's decision, explaining that "Modoc served as an arm of the sovereign tribes, acting as more than a mere business. Modoc's board of directors consisted of two representatives from each . . . tribal government . . . Modoc was organized to control a collective enterprise and therefore falls within the scope of the Indian Tribe exemption of Title VII." Id. at 1188; see also Hagen, 205 F.3d at 1043 (explaining that the Ninth Circuit in Pink "held that a nonprofit health corporation created and controlled by Indian tribes is entitled to tribal immunity . . . ").

As in Pink, the Tenth Circuit case of Dille involved an employment discrimination claim. 801 F.2d at 374. In Dille, the former employees of the Council of Energy Resource Tribes ("CERT") alleged that CERT had illegally discriminated against them based on their sex. Id. at

---

[6] Title VII precludes employers from engaging in discriminatory practices. "Congress, however, exempted 'Indian tribes' from the scope of the definition of 'employer' as used in Title VII." Pink, 157 F.3d at 1188 (citing 42 U.S.C. § 2000e(b)).

15

374. CERT was a council comprised of 39 Indian tribes that joined together to manage collectively their energy resources. Id. CERT's board of directors was composed of the designated representatives of each tribe, and the tribes maintained exclusive control over CERT's operations. Id. The district court dismissed the employees' claims, finding that CERT was entitled to the Indian tribe exemption of Title VII. Id. In affirming the district court's decision, the Tenth Circuit noted that the establishment of CERT was exactly the sort of activity that Congress sought to promote when it exempted Indian tribes from the requirements of Title VII. Id. at 375. The Tenth Circuit explained that because CERT was "entirely comprised of the member tribes and the decisions of the council are made by the designated representatives of those tribes, CERT falls directly within the scope of the Indian tribe exemption that Congress included in Title VII." Id. at 376.

While the Title VII decisions in Pink and Dille, the Eleventh Circuit's decision in Taylor, and the Eighth Circuit cases of Amerind, Hagen, Weeks, and Dillon provide guidance, they do not establish a specific test or list of factors for courts to consider when determining whether an organization is entitled to tribal sovereign immunity. Several courts have attempted to do so, however. See Breatkthrough Mgmt. Grp., Inc. v. Chukchansi Econ. Dev. Auth., 629 F.3d 1173 (10th Cir. 2010); Gristede's Foods, Inc. v. Unkechuage Nation, 660 F.Supp. 2d 442 (E.D.N.Y. 2009); Runyon ex rel B.R. v. AVCP, 84 P.3d 437 (Alaska 2004); Wright v. Prairie Chicken, 1998 S.D. 46, 579 N.W.2d 7; Gavle v. Little Six, Inc., 555 N.W.2d 284 (Minn. 1996). The tests employed by these courts are variations of what is typically referred to as the "subordinate economic entity" analysis. See Somerlott v. Cherokee Nation Distrib., Inc., No. CIV-08-429-D, 2010 WL 1541574, *3 n.1 (W.D. Okla. 2010).

In <u>Wright</u>, the Supreme Court of South Dakota outlined a series of factors courts have

used to determine whether an organization is entitled to tribal sovereign immunity:

> [C]ourts generally consider such factors as whether: the entity is
> organized under the tribe's laws or constitution rather than Federal
> law; the organization's purposes are similar to or serve those of
> the tribal government; the organization's governing body is
> comprised mainly of tribal officials; the tribe has legal title or
> ownership of property used by the organization; tribal officials
> exercise control over the administration or accounting activities
> of the organization; and the tribe's governing body has power to
> dismiss members of the organization's governing body.  More
> importantly, courts will consider whether the corporate entity
> generates its own revenue, whether a suit against the corporation
> will impact the tribe's fiscal resources, and whether the subentity
> has the power to bind or obligate the funds of the tribe.  The
> vulnerability of the tribe's coffers in defending a suit against the
> subentity indicates that the real party in interest is the tribe.

1998 S.D. 46, ¶ 10, 579 N.W. 2d at 9-10 (quoting <u>Ransom v. St. Regis Mohawk Educ. & Comm.</u>

<u>Fund., Inc</u>, 658 N.E.2d 989, 992 (N.Y. 1995)); <u>see also</u> <u>Gristede's Foods</u>, 660 F.Supp.2d at 477-

78 (listing similar factors).

The Minnesota Supreme Court applied a more truncated version of the "subordinate

economic analysis" in <u>Gavle</u>.  In <u>Gavle</u>, the plaintiff brought a state court action against Little

Six, Inc., a tribal business entity that owned and operated a casino.  555 N.W. 2d at 287.  The

court considered the following factors when determining whether tribal sovereign immunity

extended to Little Six, Inc.:

> 1) whether the business entity is organized for a purpose that is
> governmental in nature, rather than commercial;[7]

---

[7] In <u>Kiowa Tribe of Okla. v. Mfg. Tech., Inc.</u>, 523 U.S. 751 (1998), the Supreme Court held
that "Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental
or commercial activities and whether they were made on or off a reservation." <u>Id.</u> at 760.  In the
wake of <u>Kiowa</u>, at least two courts have expressed doubt about whether the
governmental/commercial distinction is still relevant.  <u>See</u> <u>Cash Advance & Pref. Cash Loans v.</u>

> 2) whether the tribe and the business entity are closely linked in
> governing structure and other characteristics; and
> 3) whether federal policies intended to promote Indian tribal
> autonomy are furthered by the extension of immunity to the
> business entity.

Id. at 294; see also Trudgeon v. Fantasy Springs Casino, 71 Cal. App. 4th 632, 84 Cal. Rptr. 2d

65, 69 (1999) (adopting the three-factor Gavle analysis).

In support of its argument that Great Plains is not entitled to sovereign immunity, J.L.

Ward relies mainly on Runyon, 84 P.3d 437.[8]  Runyon involved a tort action against the

Association of Village Council Presidents ("AVCP"), a nonprofit Alaska corporation that

_____

State, 242 P.3d 1099, 1110-11 (Colo. 2010) (stating that the factors of the "subordinate economic
entity" analysis that examine the purpose of the entity claiming tribal sovereign immunity
"contradict U.S. Supreme Court precedent rendering the entity's purpose and its activities
irrelevant to the determination whether it qualifies for immunity.") (citing Kiowa, 523 U.S. at
754-55); Trudgeon, 84 Cal. Rptr. 2d at 69 ("If a tribe enjoys immunity for its commercial as well as
its governmental activities, then arguably the fact it creates a business entity for a purely
commercial purpose should not matter in determining the immunity of the entity."); see also
Amerind, 633 F.3d at 695 (Bye, J., dissenting) (stating that "Kiowa Tribe renders irrelevant the
distinction between governmental functions and commercial activities when determining whether
a particular tribal entity enjoys immunity . . .). Kiowa involved a suit directly against a tribe, not
against a separate entity, however. Whether an entity acted as an "arm" of the government remains
important to determining the *closeness* of the relationship between the entity and the tribe. Indeed,
the Tenth Circuit in Breakthrough Mgmt. v. Chukchansi Gold Casino, 629 F.3d 1173 (10th Cir.
2010), looked at an entity's purpose when determining whether the entity was entitled to sovereign
immunity. Id. at 1192 ("The [purpose] factor also weighs strongly in favor of immunity because the
Authority and the Casino were created for financial benefit of the Tribe and to enable it to engage in
various governmental functions."); see also Johnson v. Harrah's Kan. Casino Corp., No. 04-4142-
JAR, 2006 WL 463138, at *5-6 (D. Kan. Feb. 23, 2006) (acknowledging that "the Supreme Court
does not draw a distinction between commercial and governmental activities of a *Tribe* when
determining whether that tribe enjoys sovereign immunity for a particular act," but going on apply
the "purpose" factor of the subordinate economic entity test).

[8]  J.L. Ward also cites and engages in a limited discussion of McNally CPA's & Consultants v.
DJ Hosts, Inc., 692 N.W.2d 247 (Wis. App. 2004). In McNally, however, the Wisconsin Court of
Appeals held only that "when the sole facts are that an Indian tribe purchases all of the shares of an
existing for-profit corporation and takes control over the operations of the corporation, tribal
immunity is not conferred on the corporation." Id. at 253.

consisted of 56 federally recognized Indian tribes. Id. at 438. AVCP's board of directors was composed of one representative from each of the tribes. Id. As part of their operation of "a wide range of traditionally governmental programs designed to benefit the member tribes" AVCP entered into contracts with the United States government under the ISDEAA. Id. In determining whether AVCP was entitled to sovereign immunity, the court in Runyon treated AVCP's financial relationship with the tribes as a threshold determination; the court would consider factors such as the tribes' control over AVCP or the nature of AVCP's work only if the tribes would be financially liable for AVCP's legal obligations. Id. at 441. The Runyon court explained that:

> The entity's financial relationship with the tribe is . . . of paramount importance—if a judgment against it will not reach the tribe's assets or if it lacks the power to bind or obligate the funds of the tribe, it is unlikely that the tribe is the real party in interest. If, on the other hand, the tribe would be legally responsible for the entity's obligations, it may be an arm of the tribe.

Id. at 440-41 (internal marks and citations omitted). Because the tribes would not be financially liable for a judgment against AVCP, the court in Runyon found that the tribes were not the real party in interest and held that AVCP was not entitled to the protection of tribal sovereign immunity. Id. at 441.

J.L. Ward urges this Court to apply the Runyon "real party in interest" test and argues that, because the tribes would not be liable for a judgment against Great Plains, Great Plains is not entitled to sovereign immunity. However, in Breakthrough Mgmt. v. Chukchansi Gold Casino, 629 F.3d 1173 (10th Cir. 2010), the Tenth Circuit specifically refused to apply the Runyon "real party in interest" test when determining whether a tribal casino and an entity that owned and operated the casino were entitled to sovereign immunity. Id. at 1186-87. In

19

Breakthrough, BMG, a Colorado corporation, sued the Chukchansi Gold Casino ("Casino") and the Chukchansi Economic Development Authority ("Authority"), which owned and operated the Casino. Id. at 1177. The Casino and the Authority filed a motion to dismiss claiming that they were entitled to sovereign immunity. The district court applied the threshold inquiry of Runyon—as articulated in Johnson v. Harrah's Kan. Casino Corp., No. 04-4142-JAR, 2006 WL 463138 (D. Kan. Feb. 23, 2006)[9]— and asked "whether the Tribe will be financially liable for legal obligations incurred by the Casino and the Authority." Breakthrough, 629 F.3d at 1179. Based upon this inquiry, the district court found that the Casino and the Authority were not entitled to sovereign immunity and denied their motion to dismiss. Id.

On appeal, the Tenth Circuit reversed the district court for applying the incorrect legal standard when it "treated the financial impact on a tribe of a judgment against its economic entities as a threshold inquiry. Our precedent demonstrates that there is no threshold determination to be made in deciding whether economic entities qualify as subordinate economic entities entitled to share in a tribe's immunity." Id. at 1181. Instead, the Tenth Circuit found it proper to look to a number of factors when examining the relationship between an economic entity and a tribe, including, but not limited to: 1) the entity's method of creation; 2) the entity's purpose; 3) the entity's structure, ownership, and management, including the level of control the tribe exercises over the entity; 4) whether the tribe intended to extend its sovereign immunity to the entity; 5) the financial relationship between the tribe and the entity; and 6) whether the

---

[9] Johnson discussed Runyon and applied Runyon's threshold inquiry in determining whether an entity was entitled to sovereign immunity. 2006 WL 463138, at *5.

purposes of tribal sovereign immunity are served by granting immunity to the entity. Id. at 1181.[10]

Rather than following the approach in Runyon, this Court analyzes Great Plains' claim of sovereign immunity based on the factors set forth in cases like Breakthrough, Gavle, and Wright. Two of the factors militate against sovereign immunity for Great Plains. Great Plains was created by incorporation under South Dakota, rather than tribal, law at the behest of sixteen different tribes. A suit against Great Plains would not appear to affect, at least not directly, any particular tribe's fiscal resources.

The remaining factors, however, establish that Great Plains is the sort of tribal entity entitled to sovereign immunity. The purposes for which the sixteen tribes formed Great Plains—to act as a formal representative of the tribes to the federal government and to provide health care and related services to tribal members and member Indian tribes—are closer to the functions of a tribal government than a business. See Pink, 157 F.3d at 1187 (nonprofit organization created by two tribes to provide services to tribal members pursuant to the ISDEAA "served as an arm of the sovereign tribes, acting as more than a mere business."); Gavle, 555 N.W.2d at 294 (extending sovereign immunity to tribal business entity in part because the entity had been created for the purpose of improving the general welfare of the Indian tribe); Ransom, 658 N.E.2d at 992-93 (nonprofit corporation created by tribe was entitled to sovereign immunity in part because the corporation was established to "enhance the health, education and welfare of Tribe members, a function traditionally shouldered by tribal government."); (Patrice H. Kunesh,

---

[10] In a footnote, the Tenth Circuit cautioned that "we have *not* concluded that those factors constitute an exhaustive listing or that they will provide a sufficient foundation in every instance for addressing the tribal-immunity question related to subordinate economic entities." Breakthrough, 629 F.3d at 1187 n.10.

Tribal Self-Determination in the Age of Scarcity, 54 S.D. L. Rev. 398, 402 (2009) ("When a tribe establishes an entity to conduct certain activities, such as housing authorities, health agencies, educational institutions, cultural centers, and corporate gaming operations, the entity is immune from suit if it functions as an arm of the tribal government.").

Great Plains and the sixteen tribes are closely linked in terms of management and composition. Great Plains is governed almost exclusively by tribally-elected presidents or chairpersons who must "relinquish their position when they fail to be re-elected by their Tribal or other related governing body to be an official delegate to [Great Plains]." Great Plains Articles of Incorporation, Art. VIII; His Horse is Thunder Aff. ¶ 3. Great Plains is thus accountable to the individual tribes and tribal members through the tribes' representatives on Great Plains' board of directors. See Dille, 801 F.2d at 376 (because council of tribes that joined together to manage their energy resources was "entirely comprised of the member tribes and the decisions of the council [were] made by the designated representatives of those tribes, [the council] falls directly within the scope of the Indian tribe exemption that Congress included in Title VII.").

Finally, the purposes of tribal sovereign immunity would be furthered by extending the tribes' immunity to Great Plains. Providing adequate health care to their constituents—a group that suffers disproportionately from certain diseases and has a lower life expectancy than other Americans[11]—is a very real concern for sovereign Indian tribes. The sixteen tribes created Great

---

[11] See U.S. Comm'n on Civil Rights, Broken Promises: Evaluating the Native American Health Care System 7-8 (2004), available at http://www.usccr.gov/pubs/nahealth/nabroken.pdf ("Native Americans are 770 percent more likely to die from alcoholism, 650 percent more likely to die from tuberculosis, 420 percent more likely to die from diabetes, 280 percent more likely to die from accidents, and 52 percent more likely to die from pneumonia or influenza than the rest of the United States, including white and minority populations. As a result of these increased

22

Plains to represent the health care interests of their members to the federal government and to participate in the establishment of health care programs unique to the tribes' needs. By engaging in these activities, Great Plains promotes the preservation of tribal cultural autonomy and tribal self-determination, two of the federal policies behind tribal sovereign immunity. See Breakthrough, 629 F.3d at 1188 (explaining that the policies underlying tribal sovereign immunity include "preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians.") (internal marks and citations omitted); Am. Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe, 780 F.2d 1374, 1378 (8th Cir. 1985) ("Indian tribes enjoy sovereign immunity because . . . immunity is thought necessary to promote the federal policies of tribal self-determination, economic development, and cultural autonomy."). Further supporting the conclusion that the purposes of sovereign immunity are served by extending the tribes' immunity to Great Plains is the fact that Great Plains enters into contracts under the ISDEAA, an act whose very purpose was to promote tribal autonomy and self-determination. See 25 U.S.C. § 450(a); FGS Constructors, Inc. v. Carlow, 64 F.3d 1230, 1234 (8th Cir. 1995) ("The ISDEAA promotes the long-standing federal policy of encouraging Indian self-determination, giving Indian tribes control over the administration of federal programs benefitting Indians.").

**C) Affect of Great Plains' Sovereign Immunity on J.L. Ward's Claims**

---

mortality rates, the life expectancy for Native Americans is 71 years of age, nearly five years less than the rest of the U.S. population.") (footnotes omitted); see also S.D. Advisory Comm., Native Americans in South Dakota: An Erosion of Confidence in the Justice System (2000), available at http://www.usccr.gov/pubs/sac/sd0300/ch1.htm ("On average, men in Bangladesh can expect to live longer than Native American men in South Dakota. A study by the Harvard School of Health in conjunction with health statisticians from the Centers for Disease Control found that Native American men living in six South Dakota counties had the shortest life expectancy in the Nation." ).

The Court's determination that Great Plains is entitled to sovereign immunity does not necessarily mean that all of J.L. Ward's claims should be dismissed. An immune tribal entity may still be subject to suit if "Congress has authorized the suit or the [tribal entity] has waived its immunity." See Kiowa Tribe v. Mfg. Technologies, Inc., 523 U.S. 751, 754 (1998). J.L. Ward asserts the existence of both of these conditions, contending that Congress has authorized copyright suits against Indian tribes and that the dispute resolution clause in the 2007 and 2010 contracts waives Great Plains' sovereign immunity. The Court addresses these arguments in turn.

## 1. Congressional Waiver of Tribal Sovereign Immunity Through Copyright Act

"It is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978) (internal quotation marks omitted); see also N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty., 991 F.2d 458, 462 (8th Cir. 1993) ("Congress has the power to statutorily waive a tribe's sovereign immunity. The Supreme Court pointed out that courts should tread lightly in the absence of clear indications of legislative intent when determining whether a particular federal statute waives tribal sovereign immunity.") (internal quotation marks omitted). J.L. Ward argues that the Copyright Act waives tribal sovereign immunity because it is a statute of general applicability. "The Supreme Court has stated that 'general acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary.'" E.E.O.C. v. Fond du Lac Heavy Equip. & Const., 986 F.2d 246, 248 (8th Cir. 1993) (citing Fed. Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 120 (1960)). That a general federal statute applies to Indian tribes does not mean that Congress has waived tribal sovereign immunity for purposes of private actions to enforce the statute, however. Basset v. Mashantucket Pequot Tribe, 204 F.3d 343, 357 (2nd Cir. 2000) ("[T]he fact that a statute applies to Indian tribes does not mean that

Congress abrogated tribal immunity in adopting it."); Fla. Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Fla., 166 F.3d 1126, 1129-34 (11th Cir. 1999) (holding that the Americans with Disabilities Act, although applicable to Indian tribes, did not waive tribes' sovereign immunity for purposes of private suits to enforce the Act).

J.L. Ward's briefs to this Court contain no discussion of the language or legislative history of the Copyright Act, much less a discussion of language in the Copyright Act that unequivocally expresses Congress' intent to abrogate tribal sovereign immunity with respect to copyright claims. The Copyright Act does not eliminate tribal sovereign immunity for suits on copyright claims. See Basset, 204 F.3d at 357 (2nd Cir. 2000) ("[T]he Tribe is immune from suit on [the plaintiff's] copyright claims. Nothing on the face of the Copyright Act purports to subject tribes to the jurisdiction of the federal courts in civil actions brought by private parties and a congressional abrogation of tribal immunity cannot be implied.") (internal quotation marks and citation omitted); Multimedia Games, Inc. v. WLGC Acquisition Corp., 214 F. Supp. 2d 1131, 1135 (N.D. Okla. 2001) ("Although federal courts have exclusive jurisdiction over causes of action arising under the federal copyright laws, this Court finds that the text of the Copyright Act of 1976 and the accompanying legislative history of the statute did not affirmatively contemplate the inclusion of Indian tribes, and thus, the abrogation of tribal sovereign immunity as to this cause of action.").

**2. Dispute Resolution Clause**

An Indian tribe or tribal entity may waive its sovereign immunity by contract if it does so with "requisite clarity." See C & L Enter., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 532 U.S. 411, 418 (2001); Colombe, 2011 WL 4458795, at *6-7. While a contractual waiver of sovereign immunity must be unequivocal, it need not contain "'magic words' stating

25

that the tribe hereby waives its sovereign immunity." Rosebud Sioux Tribe v. Val-U Const. Co. of S.D., Inc., 50 F.3d 560, 563 (8th Cir. 1995); see also William C. Canby, American Indian Law 110 (5th ed. 2009) ("Although the intention to waive must be clear, the waiver need not include the precise term "'sovereign immunity.'").

In C&L Enterprises, the Supreme Court of the United States held that a tribe waived its sovereign immunity by entering into a form construction contract with a clause requiring arbitration of all contract-related disputes and agreeing that arbitration awards may be enforced "in any court having jurisdiction thereof." C&L Enterprises, 532 U.S. at 418-19. The Eighth Circuit has reached similar results. See Oglala Sioux Tribe v. C & W Enter., Inc., 542 F.3d 224, 230 (8th Cir. 2008) ("The [Supreme] Court found, as this Circuit has done previously, that an arbitration clause alone was sufficient to expressly waive sovereign immunity to a state court enforcement action.") (citing C& L Enterprises, 532 U.S. at 417-18); see also Val-U Const., 50 F.3d at 563 (finding that the following language in a contract was a clear expression of waiver of a tribe's sovereign immunity: "All questions of dispute under this Agreement shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association.").

Here, the 2007 contract and the alleged contract from 2010 contained the same dispute resolution clause. This clause provided that disagreements between the parties would be settled by mediation and, if necessary, by arbitration "pursuant to South Dakota Statutes, using the offices of the American Arbitration Association or other neutral arbitration service agreed upon . . ." Doc. 23-1; Doc. 23-2. The dispute resolution clause further provided that "[t]he parties agree that either party may seek judicial review by way of a petition to the court to confirm, correct or vacate an arbitration award . . . The mediation, the arbitration and any application to

26

the court or other court proceedings shall be venued exclusively in Rapid City, South Dakota."
Id. The parties do not dispute that they entered into a contract in 2007, which contained this
language. This language contemplates a limited waiver of Great Plains' sovereign immunity;
the parties have agreed to arbitrate claims arising out of the contract and have provided, by way
of judicial review in Rapid City, South Dakota, an enforcement mechanism for any such
arbitration award. See Val-U Const. 50 F.3d at 562 ("By designating arbitration in accordance
with specified arbitration rules as the forum for dispute resolution, the parties clearly intended
a waiver of sovereign immunity with respect to resolving disputes under the contract. By
definition such disputes could not be resolved by arbitration if one party intended to assert
sovereign immunity as a defense.").

     This limited waiver of sovereign immunity does not necessarily grant this Court authority
to exercise jurisdiction over all claims in J.L. Ward's Complaint, however. See Colombe, 2011
WL 4458795, at *8. When a tribe or tribal entity waives its sovereign immunity, it "may
prescribe the terms and conditions on which it consents to be sued, and the manner in which the
suit shall be conducted." Mo. River Serv., Inc. v. Omaha Tribe of Neb., 267 F.3d 848, 852 (8th
Cir. 2001) (citation omitted); Oglala Sioux Tribe, 542 F.3d 231 ("A sovereign tribe has full
authority to limit any waiver of immunity to which it consents."). "In addition, if a tribe does
consent to suit, any conditional limitation it imposes on that consent must be strictly construed
and applied." Mo. River Serv., 267 F.3d at 852 (internal marks and citation omitted).

     The language of the dispute resolution clause limited Great Plains' waiver of sovereign
immunity to the arbitration of disputes arising out of the contract and to the judicial enforcement
or modification of any arbitration award. In the present case, however, J.L. Ward is alleging not
only a breach of contract, but also claims of negligent misrepresentation, fraudulent

misrepresentation, and unjust enrichment. J.L. Ward is not seeking to compel arbitration or the enforcement or modification of an arbitration award. In short, the language of the dispute resolution clause does not waive sovereign immunity to allow a federal court to address the merits of the claims in J.L. Ward's Complaint. See Tamiami Partners v. Miccosukee Tribe of Indians of Fla., 63 F.3d 1030, 1048-49 (11th Cir. 1995) (language in contract waiving tribe's sovereign immunity with respect to demands for arbitration or enforcement of arbitration awards did not waive tribe's sovereign immunity for purposes of contractor's claim that tribe had breached the contract ); Big Valley Band of Pomo Indians v. Superior Court, 35 Cal. Rptr. 3d 357, 365 (Cal. App. 1 Dist. 2005) ("[T]he Tribe's consent to arbitrate and to judicial enforcement of an award cannot be interpreted as its consent to be sued for all causes of action arising from a contract containing an arbitration clause."); Canby, supra, 110 ("A waiver of immunity arising from an arbitration agreement is limited to arbitration and its enforcement, however; it does not extend to all kinds of litigation that might arise from the subject matter of the contract."); Conference of Western Attorneys General, American Indian Law Deskbook, 303 (4th ed. 2008) (explaining that most courts view "typical commercial arbitration provisions as waiving a tribe's immunity both for purposes of the arbitration itself and for any ensuing judicial enforcement proceedings, but as not waiving tribal immunity for any other form of relief.").

The parties do not dispute that they entered into a contract in 2007 containing the dispute resolution language as well as provisions protecting J.L. Ward's copyrights. J.L. Ward at a minimum appears to be able to maintain a claim to compel arbitration for Great Plains' alleged violation of copyrights based on the language of the 2007 contract. Whether the parties entered into a contract in 2010 with similar language is in dispute and affects whether Great Plains has or has not waived sovereign immunity for the remaining contract-based claims.

28

J.L. Ward's Complaint does not seek to compel arbitration, but to have this Court assume jurisdiction and decide the merits of the claims. Such a claim disregards the dispute resolution clause in the 2007 contract and the asserted 2010 contract. The extent of this Court's jurisdictional power in this case at this time is limited to compelling arbitration over the copyright claims under the 2007 contract (which is terminated and which expressly stated that only certain provisions, including those for copyright protection and dispute resolution, survive termination) and over contract-based claims if and only if a contract was reached in 2010. J.L. Ward at this time has not pleaded such a claim. Accordingly, this Court will permit J.L. Ward twenty-one days from the date of this Order to amend its Complaint to state a claim to compel arbitration. If J.L. Ward chooses not to amend its Complaint, then this Court will dismiss J.L. Ward's Complaint for a lack of jurisdiction over the claims pleaded.

**D) Diversity Jurisdiction**

In its Reply Brief to Plaintiff's Response to Defendant's Motion to Dismiss (Doc. 25), Great Plains argues that the Court lacks diversity jurisdiction over this case. Federal diversity jurisdiction under 28 U.S.C. § 1332(a)(1) exists if the amount in controversy exceeds $75,000 and the suit is between citizens of different states. Section 1332(c)(1) provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . ." Here, J.L. Ward's Amended Complaint (Doc. 14) alleges diversity jurisdiction because it is a California corporation with its principal place of business in Lakeside, California, and Great Plains is a South Dakota corporation with its principal place of business in Rapid City, South Dakota.[12]

---

[12] The parties do not dispute that the amount in controversy in this case exceeds $75,000.

29

Great Plains argues that there is no diversity jurisdiction because "'Indian tribes are not citizens of any state for purposes of diversity jurisdiction.'" (Doc. 25) (quoting Whiteco Metrocom v. Yankton Sioux Tribe, 902 F.Supp. 199, 201 (D.S.D. 1995)). Although this is a correct statement of the law, Great Plains is not an Indian tribe itself. Nor is this a situation like the one in Auto-Owners Ins. Co. v. Tribal Court of Spirit Lake Indian Reservation, 495 F.3d 1017 (8th Cir. 2007), where the Eighth Circuit found that Tate Topa—an apparently unincorporated tribal education board and school—was part of the Spirit Lake Sioux Tribe and was thus not a citizen of any state for purposes of § 1332 diversity jurisdiction. Id. at 1021 ("In the present case, no diversity jurisdiction exists as a basis for subject matter jurisdiction because Tate Topa—a sub-entity of the Spirit Lake Sioux Tribe—is considered a part of the Indian tribe."); see also Wells Fargo Bank v. Lake of the Torches Econ. Dev. Corp., 658 F.3d 684, 693 (7th Cir. 2011) ("Our colleagues in the Eighth Circuit have held that an unincorporated school board operated by an Indian tribe and 'considered part of the Indian tribe' is not a citizen of a state.") (citing Auto-Owners, 495 F.3d at 1021). The facts in this case differ from those in Auto-Owners in one important respect: unlike the tribal education board and school, Great Plains is incorporated under state law. The distinction between an unincorporated tribal entity and an incorporated tribal entity is well-recognized and critical to determining whether Great Plains is a citizen of any state for purposes of diversity jurisdiction. See Wells Fargo, 658 F.3d at 693-94 (finding that a tribal corporation should be treated as a citizen of a state under § 1332(c) and explaining that the Seventh Circuit understood the Eighth Circuit's decision in Auto-Owners as applying "only to *unincorporated* tribal agencies."); Cook v. AVI Casino Enters., Inc., 548 F.3d 718, 722-23 (9th Cir. 2008) (recognizing that an "Indian tribe or an unincorporated arm of a tribe

30

is not a citizen of any state" but finding that "an entity incorporated under tribal law is the equivalent of a corporation created under state or federal law for diversity purposes" and thus "should be analyzed for diversity jurisdiction purposes as if it were a state or federal corporation.") (internal quotation marks omitted); Am. Vantage v. Table Mountain Rancheria, 292 F.3d 1091, 1094 n.1 (9th Cir. 2002) (finding that a tribe's unincorporated casino was a stateless entity but explaining that "[a] tribal subentity . . . may incorporate under state law. An incorporated tribe, or an incorporated arm of a tribe, is, like any other corporation, ordinarily a citizen of the state in which it resides.") (internal citations omitted); Gaines v. Ski Apache, 8 F.3d 726, 729 (10th Cir. 1993) (concluding that an unincorporated tribal entity was not a citizen of any state but acknowledging that "[a] tribe may . . . charter a corporation pursuant to its own tribal laws, and such a corporation will be considered a citizen of a state for purposes of diversity jurisdiction."); M. Brent Leonhard, Tribal Contracting 32 (2009) (explaining that "whether or not [a tribal] entity is a corporation is the critical factor for diversity jurisdiction purposes.");13D Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure, § 3579 (3d ed.) (explaining that while an Indian tribe is not a citizen of any state, an "Indian tribe or subdivision may incorporate . . . in which case it may have state citizenship for diversity of citizenship purposes, just as any corporation.") (footnote omitted); see also Cohen, supra, at § 7.04[1][c] ("A tribe that incorporates as an entity under state law can become a citizen of the state of its principal place of business and thus create diversity of citizenship relative to a party domiciled in another state."); Canby, supra, at 249 (5th ed. 2009) ("A tribe may, however, charter a tribal corporation that becomes a citizen of the state of its principal place of business for purposes of diversity jurisdiction.").

31

Because Great Plains is a South Dakota corporation with its principal place of business in Rapid City, South Dakota, it is diverse from J.L. Ward for purposes of § 1332 jurisdiction. The analysis of whether Great Plains is a citizen of South Dakota differs from the analysis of whether Great Plains is a tribal entity entitled to sovereign immunity. For the reasons explained above Great Plains has sovereign immunity from the claims as pleaded in the Complaint.

Therefore, it is

ORDERED that J.L. Ward has leave to file an Amended Complaint within twenty-one days of this order to set forth claims to compel arbitration of contract-based claims including the copyright claims. It is further

ORDERED that if J.L. Ward chooses not to amend its Complaint within the time allowed, Great Plains' Motion to Dismiss shall be granted.

Dated January 13 , 2012.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE